**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**MARY ANN ROSS,**

                              **Plaintiff,**

    **vs.**                                                               **1:15-cv-01094**
                                                                         **(MAD/CFH)**

**UNITED STATES OF AMERICA,**

                              **Defendant.**

_____

**APPEARANCES:**                                     **OF COUNSEL:**

**MARY ANN ROSS**
114 Main Street
Argyl, New York 12809
Plaintiff, *pro se*

**U.S. DEPARTMENT OF JUSTICE**           **CATHLEEN B. CLARK, AUSA**
James T. Foley Courthouse
445 Broadway
Albany, New York 12207
Attorney for Defendant

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

On September 10, 2015, Mary Ann Ross ("Plaintiff") commenced this action *pro se* pursuant to 42 U.S.C. § 1983 ("Section 1983") against the United States of America, Albany Stratton VA Medical Center, Cardiology Department of the Albany Stratton VA Medical Center, Marisa Orega, MD, Michele K. Rawlins, Mohamma El-Hajjar, MD, Jessica Saunders, Sidhu Mandeep, MD, and Doris Scheweickert. *See* Dkt. No. 1. In the complaint, Plaintiff asserts causes of action for medical negligence and wrongful death. *See id.* at ¶ 5. Specifically, Plaintiff's claims are based upon her opinion that, from 2012 through 2013, her husband's (John L.

Ross) medical providers at the VA failed to treat Mr. Ross' heart disease, thereby resulting in his death on May 26, 2013. Defendants moved to dismiss Plaintiff's action or, in the alternative, for a more definite statement. *See* Dkt. No. 13; Dkt. No. 21. The Court granted the named Defendants' motion to dismiss with leave to replead claims against the United States ("Defendant") within thirty days. *See* Dkt. No. 31. Additionally, the Court clarified that Plaintiff's claim must be brought pursuant to the Federal Tort Claims Act, not Section 1983. Plaintiff filed a second amended complaint and Defendant filed an answer in response. *See* Dkt. No. 35; Dkt. No. 40.

Currently before the Court is Defendant's motion for summary judgment or, in the alternative, motion to dismiss. *See* Dkt. No. 53.

## II. BACKGROUND

Mr. Ross was nearly sixty-four years old when he died on May 26, 2013. *See* Dkt. No. 54-6. Based on his medical records, at the time of his death, Mr. Ross had a medical history that included the following medical diagnoses: insulin dependent diabetes mellitus ("IDDM"), first diagnosed in 1995; carotid artery stenosis; coronary artery disease ("CAD"); hypertension; renovascular hypertension; hyperlipidemia; hypercholesterolemia; and gout. *See generally* Dkt. No. 54-7. Mr. Ross also had a family history of similar medical conditions, in that his father died at the age of sixty four of CAD and his sister died of CAD at the age of forty eight. *See id.* at 63.

In 2008, at the age of fifty eight, Mr. Ross had a cardiac work up for complaints of chest pain and shortness of breath associated with moderate exertion. *See* Dkt. No. 54-8. A stress test was performed which showed cardiac ischemia. *See id.* at 2-9. Nuclear imaging showed a large area of ischemia in the anterior and inferolateral distribution. *See id.* A cardiac catheterization was performed and revealed severe CAD. *See id.* Mr. Ross was referred for a three-vessel

2

coronary artery bypass graft ("CABG") surgery, which was performed on February 27, 2008 at the VA Medical Center in Buffalo, New York. *See id.*

This work up revealed that, in addition to his heart disease, Mr. Ross also had significant disease in the carotid arteries. *See id.* Specifically, his left carotid artery was found to be 80-89% narrowed. *See id.* Therefore, on May 2, 2008, Mr. Ross underwent a left carotid endarterectomy ("CEA") at the Albany Stratton VA Medical Center ("VA"). *See id.* at 10-11. After the CEA, Mr. Ross had routine follow-up duplex scans at the VA in 2008, 2009, 2010, 2011, and 2012, which showed no evidence of significant carotid artery stenosis. *See* Dkt. No. 54-9. The last scan Mr. Ross had before his death showed only "a small amount of plaque within the carotid arteries bilaterally." *Id.* at 7.

At a routine cardiology appointment at the Albany Stratton VA on March 30, 2009, Mr. Ross was diagnosed with a new onset of atrial flutter.[1] *See* Dkt. No. 54-8 at 12-13. Mr. Ross' cardiologist increased his prescription for Lopressor, started him on Warfarin (Coumadin), and ordered an echocardiogram. *See id.* at 12-16. The echocardiogram, performed on April 30, 2009, showed a moderately dilated left ventricle and severe bi-atrial enlargement. *See id.* at 15. The aortic valve was also calcified and sclerotic, but it still opened well. *See id.* Additionally, it was noted that Mr. Ross' ejection fraction was reduced at 35%. *See id.*

Since Mr. Ross had recurrent atrial flutter, he underwent cardioversion on June 5, 2009. *See* Dkt. No. 54-8 at 20. The procedure was unsuccessful, with a post-cardioversion electrocardiogram ("EKG") showing that the patient remained in atrial flutter. *See id.* at 22. As

---

[1] Atrial flutter is an abnormal heart rhythm in which the upper chambers of the heart (atria) beat too fast, which results in atrial muscle contractions that are faster than and out of sync with the ventricles (the lower chambers of the heart). *See* Dkt. No. 54-3 at ¶ 7. In contrast to atrial fibrillation ("Afib"), a more common heart rhythm disorder, with atrial flutter the heart generally still beats in a regular pattern, but usually quite rapidly. *See id.*

such, the VA referred Mr. Ross to Albany Medical Center for an ablation procedure, which successfully treated his atrial flutter. *See id.*

From 2009 through 2013, Mr. Ross was treated at the VA by his primary care provider, as well as a number of specialists, including a cardiologist, nephrologist, and rheumatologist. *See generally* Dkt. No. 54-7. According to the expert retained by the Government, Dr. Eugene Lozner, the medical care provided by the VA during this period was consistent with the applicable standard of care. *See* Dkt. No. 54-3 at ¶ 31.

Mr. Ross died suddenly at home on May 26, 2013. *See* Dkt. No. 54-6. An autopsy performed at the Glens Falls Hospital showed that Mr. Ross had diffuse CAD. *See* Dkt. No. 54-10. The autopsy also revealed that Mr. Ross had severe coronary atherosclerotic artery disease and "critical stenosis with massive old myocardial infarction[.]" *Id.* at 2. Additionally, the graft vessel from the 2008 CABG surgery had moderate atherosclerosis and 50% stenosis. *See id.* Renal atherosclerotic disease with stenosis was also present. *See id.*

In its motion for summary judgment, Defendant contends that Plaintiff failed to put forth any evidence to support its theory that Defendant was negligent or that the negligence Plaintiff alleges was the proximate cause of Mr. Ross' death. *See* Dkt. No. 53-1 at 9-10. Additionally, Defendant argues that Plaintiff cannot defeat its motion for summary judgment without expert support because this case does not present facts that are so clear and obvious as to be within the understanding of an ordinary lay person. *See id.* at 10-12 (citations omitted). In response, Plaintiff generally contends that the medical records before the Court demonstrate that Defendant's negligence caused her husband's death. *See* Dkt. No. 56 at 1-15. In a sur-reply, Plaintiff continues to argue that she has submitted sufficient medical evidence to support her claim. *See* Dkt. No. 58.

## III. DISCUSSION

**A.     Standard of Review**

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted). When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Id.* at 36-37 (quotation and other citation omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleadings. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(c) (e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers*, 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2502, 2513-14, 91 L. Ed. 2d 202 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of N.Y.*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

"[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.'" *Govan v. Campbell*, 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2003) (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972) (other citations

omitted)). The Second Circuit has opined that the court is obligated to "make reasonable allowances to protect *pro se* litigants" from inadvertently forfeiting legal rights merely because they lack a legal education. *Id.* at 295 (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)) (internal quotation marks omitted). However, this does not mean that a *pro se* litigant is excused from following procedural requirements of summary judgment. *See id.* (citing *Showers v. Eastmond*, 00 CIV. 3725, 2001 WL 527484, *2 (S.D.N.Y. May 16, 2001)).

## B.    Malpractice Claim under the FTCA

"'The United States, as sovereign, is immune from suit save as it consents to be sued,' and hence may be sued only to the extent that it has waived sovereign immunity by enacting a statute consenting to suit." *Millares Guiraldes de Tineo v. United States*, 137 F.3d 715, 719 (2d Cir. 1998) (quoting *United States v. Sherwood*, 312 U.S. 584, 586 (1941)). The FTCA empowers the federal district courts with the "exclusive jurisdiction of civil actions on claims against the United States, for money damages, . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government." 28 U.S.C. § 1346(b)(1). For there to be liability, the employee's act must have taken place "while acting within the scope of his [or her] office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." *See id.*

The language, "the law of the place," means that the courts must apply "the whole law of the State" in which the alleged negligent acts occurred. *Richards v. United States*, 369 U.S. 1, 11 (1962). To establish a claim for medical malpractice under New York law, a plaintiff must prove (1) that the defendant breached the relevant standard of care, and (2) that the breach proximately caused the plaintiff's injuries. *See Arkin v. Gittleson*, 32 F.3d 658, 664 (2d Cir. 1994) (citing

6

*Gibson v. D'Amato*, 97 A.D.2d 905, 905 (3d Dep't 1983)).  New York law requires that, "'except as to matters within the ordinary experience and knowledge of laymen, . . . expert medical opinion evidence is required' to make out both of these elements."  *Milano v. Freed*, 64 F.3d 91, 95 (2d Cir. 1995) (quoting *Fiore v. Galang*, 64 N.Y.2d 999, 1001 (1985)).

While "New York law recognizes the possibility that a deviation from a proper standard of care may be so clear and obvious that it will be within the understanding of the ordinary layman without the need for expert testimony," this is generally in rare cases, such "where an unexplained injury has occurred to a part of the body remote from the site of the surgery."  *Sitts v. United States*, 811 F.2d 736, 740 (2d Cir. 1987) (citing *Acosta v. City of New York*, 67 Misc.2d, 756, 763 (N.Y. Civ. Ct. 1971)).  Where a plaintiff has "failed to submit competent medical testimony that would allow a trier of fact to find that her examination breached the applicable standard of care" summary judgment is appropriate.  *Farland v. United States*, 622 Fed. Appx. 12, 13 (2d Cir. 2015) (citation omitted).

Summary judgment is appropriate as Plaintiff admittedly has failed to presented expert testimony and Plaintiff's case is not an obvious claim of malpractice where expert testimony would not be required.  Moreover, Defendant provided expert testimony supporting its contention that medical providers at the VA did not fall below the recognized standard of care.  *See* Dkt. No. 54-3 at "Exhibit B."  In his declaration, Dr. Eugene Lozner, a licensed practicing cardiologist, sets forth Mr. Ross' comprehensive treatment at the Albany Stratton VA and opines that he received appropriate medical care for his various medical conditions.  *See* Dkt. No. 54-3 at ¶¶ 31-39.

In support of Plaintiff's negligence claim, Plaintiff relies on her lay interpretation of her deceased husband's medical records and medical history.  *See* Dkt. No. 56 at 3-5.  Plaintiff admittedly states, "NO, I don't have an 'expert witness;' not that I did not try."  *Id*. at 6.  The Court

7

recognizes that Plaintiff is appearing *pro se*, but this does not excuse her failure to procure expert medical testimony to support her claim. *See Farland*, 622 Fed. Appx at 13 (affirming summary judgment against a *pro se* plaintiff for failure to present expert medical testimony).

Plaintiff offers several opinions regarding procedures and treatment she believes that Mr. Ross should have received as part of his cardiac care. Dr. Lozner addresses each of these contentions and explains why such additional procedures and treatments were inappropriate for Mr. Ross' various conditions. *See* Dkt. No. 54-3 at ¶¶ 33-38.

As Defendant correctly notes, Plaintiff's claim is not a rare case where the standard of care would be within the knowledge of a lay juror. Through the declaration of Dr. Lozner, Defendant has established that it is entitled to summary judgment and Plaintiff's lay opinions regarding Mr. Ross' treatment fail to create questions of fact. *See Urena v. Yan Wolfson, M.D.*, No. 09-cv-1107, 2012 WL 958529, *7 (E.D.N.Y. Mar. 20, 2012) (granting the defendants' motion for summary judgment where the *pro se* plaintiff offered only his medical analysis to rebut the defendants' medical expert's opinion); *see also Shields v. United States*, 446 Fed. Appx. 325, 326 (2d Cir. 2011) (holding that the defendant was entitled to summary judgment on the plaintiff's medical malpractice claim where the plaintiff, who was acting *pro se*, failed to present expert testimony); *Smith v. Masterson*, 353 Fed. Appx. 505, 508 (2d Cir. 2009) (affirming the district court's grant of summary judgment to the defendant where the plaintiff offered only his own conclusory allegations concerning the medical care he received).

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and, for the above-stated reasons, the Court hereby

8

**ORDERS** that Defendant's motion for summary judgment is **GRANTED**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendant's favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: April 17, 2018
      Albany, New York

_/s/ Mae A. D'Agostino_
Mae A. D'Agostino
U.S. District Judge